IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

LESLIE G. WHITE, JR.                                         PLAINTIFF

v.                          Civil No. 07-3023

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                               DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Leslie White, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claims for period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to §§ 216(i) and 223 of Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 416(i) and 423.  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

## I.    Procedural Background:

The plaintiff protectively filed his applications for DIB and SSI on August 12, 2003, alleging an onset date of June 25, 2003, due to adenocarcinoma of the colon, status post colon resection surgery, the residuals of chemotherapy, mild chronic obstructive pulmonary disease ("COPD"), depressive disorder, personality disorder, and borderline intellectual functioning ("BIF").  (Tr. 77, 81, 125, 357).  An administrative hearing was held on September 22, 2005. (Tr. 360-388).

At the time of the administrative hearing, plaintiff was 47 years of age and possessed a high school education.  (Tr. 376, 894).  He had past relevant work ("PRW") as an unskilled laborer at various medium to light-exertional jobs.  (Tr. 894).

On September 27, 2006, the ALJ concluded that plaintiff suffered from severe impairments, but that his impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 8-19). After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform a range of light exertional work limited by her ability to occasionally stoop, crouch, kneel, crawl, balance, and climb; frequently grasp, perform fine manipulations, handle, feel, reach, and operate hand controls; need to avoid all exposure to heights and moderate exposure to vibrations; and, need to avoid all exposure to chemicals, noise, humidity, dust, fumes, and temperature extremes. (Tr. 16). Mentally, the ALJ found that plaintiff had a satisfactory ability to understand, remember, and carry out detailed instructions, make judgments on simple work-related decisions, interact appropriately with supervisors, the public, and co-workers; and, respond appropriately to changes in a routine work setting. He also found him to be seriously limited, but not precluded, from responding appropriately to work pressures in a usual work setting. (Tr. 16). With the assistance of a vocational expert, the ALJ then concluded that plaintiff could still perform work as a food preparer, housekeeper, and plastics worker. (Tr. 18, 140).

Plaintiff then requested a review of the hearing by the Appeals Council, which denied that request on April 5, 2007. (Tr. 3-5). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned for report and recommendation. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc.#5, 6).

AO72A
(Rev. 8/82)

## II.   <u>Standard of Review:</u>

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Id.*  "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision."  *Id.*  As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  If we find it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, we must affirm the decision of the Secretary."  *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3), 1382(3)(c).  A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

A.    **The Evaluation Process:**

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require his to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

AO72A
(Rev. 8/82)

III.   **Evidence Presented**:

On February 19, 2003, an x-ray of plaintiff's right knee revealed minimal degenerative changes.  (Tr. 165).  Minimal osteophytosis and a spiking of the tibial spines were also noted. (Tr. 165).  An electrocardiogram performed on the same date revealed a sinus rhythm within normal limits.  (Tr. 179-182).

On March 19, 2003, records indicate that plaintiff had a history of hepatitis c, depression, elbow and knee pain, and gastroesophageal reflux disease ("GERD").  (Tr. 155).  Plaintiff indicated that some of his depression was due to his lack of income and having to be financially dependent on his sister.  Plaintiff was referred to social services for counseling and prescribed Zoloft, Naproxen, and Ranitidine.  (Tr. 155).

On June 25, 2003, plaintiff was hospitalized for a purple, cold, and pulseless left foot. (Tr. 184).  An abdominal aortogram of the left lower extremity runoff revealed a blood clot in the left foot.  (Tr. 152-153, 195-197, 205-206).  It was determined that plaintiff should undergo thrombolytic and heparin therapy to shrink the clot.  During a routine work-up, it was discovered that plaintiff was anemic and experiencing abdominal pain.  A colonoscopy was then performed, along with a biopsy, which revealed a lesion in the transverse colon.  (Tr. 184, 195-196, 201-202).  On July 10, 2003, plaintiff underwent a hemicolectomy.  (Tr. 198-200).  Pathology indicated that 2 out of the 11 lymph nodes were positive for metastasis.  Plaintiff had a rocky post-operative course, including two debridements for a wound infection.  (Tr. 184).  He was released home on July 16, 2003.  (Tr. 195-196).

AO72A
(Rev. 8/82)

A pelvic CT scan preformed on July 19, 2003, revealed a 1 centimeter well defined hypodense lesion within the right posterior hepatic lobe, as well as a 1 centimeter hypodense lesion in the right anterior lobe, most likely representing simple cysts. (Tr. 191-193).

On July 21, 2003, plaintiff returned for a post-surgical follow-up and complained of chest discomfort, hiccups, shortness of breath, and difficulty swallowing. (Tr. 151-152). An examination revealed that his foot was healing well. Plaintiff was given refills of Coumadin and Percocet, along with a prescription for Thorazine to treat the hiccups. (Tr. 151).

On July 23, 2003, a chest x-ray revealed lingular infiltrate, no pleural effusions or pulmonary nodules, and an area of diminished attenuation and enhancement in the posterior right lobe of the liver. (Tr. 164).

On August 4, 2003, plaintiff underwent a right upper quadrant ultrasound. (Tr. 163, 259). It revealed no evidence of a discrete solid or cystic mass on the liver. However, due to plaintiff's history of colon cancer, correlation with CEA levels and a CT scan of the abdomen were recommended. (Tr. 163, 259).

On August 20, 2003, plaintiff reported experiencing symptoms associated with restless leg syndrome, aches and pains associated with arthritis, and depression. (Tr. 149). He indicated that he could not afford to see a vascular surgeon. Plaintiff also stated that he had discontinued taking Zoloft for his depression because he was worried about possible medication interactions. After noting that plaintiff's wound appeared to be healing well, the doctor prescribed Effexor and Elavil. (Tr. 148). The following day, Ultram was also prescribed. (Tr. 148).

On August 27, 2003, plaintiff reported for his hematology follow-up. (Tr. 189-190). Aside from some weakness, plaintiff was not experiencing any acute symptoms. The doctor did

6

note that a CT scan had revealed a suspected lesion in the right lobe of his liver, but an abdominal ultrasound was negative.  Plaintiff was diagnosed with hepatitis c, arthritis, GERD, deep vein thrombosis of the left leg (treated via Cumadin), and depression.  (Tr. 189).

On September 5, 2003, the doctor increased plaintiff's dosage of Coumadin.  (Tr. 147).  The dosage was increased again on September 15, 2003.  (Tr. 147).

On September 10, 2003, plaintiff was evaluated by Dr. Joel Picus, an onocologist.  (Tr. 184-186).  Dr. Picus noted that plaintiff had been diagnosed with a T3, N1 lesion,[1] and recommended that plaintiff proceed with chemotherapy with 5-FU and Leucovorin the following week.  The schedule would be six weeks on and two weeks off for a total of four cycles.  Plaintiff agreed to this treatment plan.  (Tr. 186).

On October 1, 2003, plaintiff complained of arthritis pain in his right knee and left shoulder.  (Tr. 256).  He indicated that the Tramadol had not helped.  Plaintiff stated that his mood had improved with the use of Effexor XR, however, he was now sleeping too much.  The doctor noted that plaintiff's blood pressure was elevated and opted to monitor the situation.  He also drained an abscess on plaintiff's abdomen.  The doctor then increased plaintiff's Tramadol dosage and directed him to continue taking the Effexor XR.  (Tr. 256).

On November 12, 2003, plaintiff's incision was well healed.  (Tr. 251).  Although plaintiff's left foot was warm, the doctor was still unable to feel a pulse.  Plaintiff reported

---

[1]A T3, N1 colorectal lesion is defined as a lesion that is confined to the perimuscular soft tissue with involvement of the lymph nodes in the area of the lesion by metastatic tumors that measure greater than 0.2 millimeters but less than 2.00 millimeters.  Carolyn C. Compton, M.D., Ph.D., and Frederick L. Greene, M.D., *The Staging of Colorectal Cancer: 2004 and Beyond*, *at* www.caonline.amcancersoc.org.  This equates to a Stage IIIA diagnosis, with the highest and worst stage being Stage IV.  *Id*.

AO72A
(Rev. 8/82)

problems with awakening at night, due to coughing and gagging, with the taste of acid in his mouth. (Tr. 257). He also stated that he experienced a burning sensation in his throat after meals. Plaintiff was diagnosed with GERD, hoarseness, colon cancer, osteoarthritis, hyperlipids, improved depression, and a history of deep vein thrombosis ("DVT"). (Tr. 251, 258). The doctor directed plaintiff to continue the Coumadin, advised him that he could increase his dosage of Ranitidine if necessary, and prescribed medication to treat his hoarseness. (Tr. 251).

On January 8, 2004, plaintiff reported taking 2-4 Ranitidine per day due to treat his GERD. (Tr. 254). He indicated that Prilosec/Prevacid had been helpful in the past. Plaintiff also complained of hoarseness for 5 weeks, a minimal cough, and insomnia with frequent waking. An upper gastrointestinal ("GI") study was then ordered. (Tr. 254).

On January 15, 2004, plaintiff underwent an upper GI study. (Tr. 252). A small hiatal hernia with a paraesophageal component and a spontaneous reflux of barium were noted in the proximal esophagus. (Tr. 252).

On January 21, 2004, an x-ray of plaintiff's right knee revealed degenerative changes. (Tr. 255). He was also continuing to experience problems with hoarseness and GERD. The doctor directed plaintiff to continue taking Prilosec, and to avoid alcohol and caffeine. He also referred plaintiff to an ear, nose, and throat doctor. (Tr. 255).

On February 4, 2004, plaintiff was nearing the end of his third cycle of chemotherapy. (Tr. 249-250). Plaintiff was doing well, although he continued to experience some fatigue and raspiness of his voice. He had also experienced some mild diarrhea, which had been responsive to Immodium. Due to palmar and plantar toxicity, plaintiff's chemotherapy dosage had to be reduced. Aside, from this, however, plaintiff's physical exam was unchanged. Dr. Picus

8

recommended that plaintiff proceed with his last full cycle of chemotherapy. Plaintiff informed Dr. Picus that he would be relocating to Arkansas. (Tr. 249-250).

On April 1, 2004, plaintiff complained of arthritis pain in his right shoulder and knee. (Tr. 242-244). He also stated that he had been examined by an ear, nose, and throat doctor regarding hoarseness. Plaintiff indicated that he had undergone a laryngoscopy, which was said to be normal. It was determined that the hoarseness was probably due to the chemotherapy. Plaintiff was diagnosed with an upper respiratory infection, osteoarthritis, colon cancer, GERD, lipoid metabolism, and depressive disorder not otherwise specified. He was prescribed Effexor, XR, Amitriptyline, Prilosec, Niaspan, Acetaminophen with Codeine, and Sulindac. (Tr. 243-244).

On May 20, 2004, plaintiff reported experiencing anal leakage approximately 20 minutes following bowel movements with some associated burning and bleeding. (Tr. 236-238). Records indicate that plaintiff had completed chemotherapy and had been told that he was cancer free. The doctor noted that plaintiff was alert and cooperative, with no symptoms of depression. (Tr. 236-238).

On May 21, 2004, plaintiff was directed to restart the Niaspan. (Tr. 230). His LDL and triglyceride levels had increased above normal limits. (Tr. 230).

Pulmonary function studies conducted on June 4, 2004, revealed the presence of mild obstructive airway disease. (Tr. 229).

On June 17, 2004, plaintiff complained of continued, frequent shortness of breath when walking and climbing steps/stairs. (Tr. 223-228). Plaintiff had reportedly decreased his smoking to one package of cigarettes over 3 days, and had stopped taking the Effexor and Amitriptyline

AO72A
(Rev. 8/82)

due to issues with impotence. Plaintiff was prescribed Albuterol, Atrovent, and a Serevent Diskus to threat his obstructive airway disease. He was also instructed regarding the use of these medications. (Tr. 224).

On December 13, 2004, an x-ray of plaintiff's chest revealed fatty infiltration of the liver and artherosclerotic peripheral vascular disease. (Tr. 284).

On February 17, 2005, Dr. Van Smith performed a neuropsychological evaluation of plaintiff, at the request of plaintiff's attorney. (Tr. 261-264). Plaintiff complained of impaired recall/declarative memory, concentration, attention to sequential detail, and word finding, as well as bradyphrenia (slowed thought processes), affective lability, and dysexecutivism (cognitive, emotional, and behavioral symptoms encountered following a brain injury to the frontal lobes). He stated that he had sustained a mild concussion approximately 2 years prior, in a biking accident. Dr. Smith noted that plaintiff was mildly anxious and dysthymic, but maintained appropriate eye contact. Testing revealed an IQ of 96. Dr. Smith diagnosed plaintiff with organic brain syndrome and cognitive dysfunction. He assessed plaintiff with a global assessment of functioning score of 60.

On February 21, 2005, Dr. Smith completed a mental RFC assessment of plaintiff. (Tr. 265-269). He concluded that plaintiff would be unable to meet competitive standards in the following areas: maintaining attention for two hour segments; maintaining regular attendance and punctuality within customary tolerances; sustaining an ordinary routine without special supervision; completing a normal work day and work week without interruptions from psychologically based symptoms; performing at a consistent pace without unreasonable number and length of rest periods; understanding, remembering, and carrying out detailed instructions;

10

setting realistic goals or making plans and independently of others; and, dealing with the stress of semiskilled and skilled work. (Tr. 267).  Finally, Dr. Smith indicated that he would be seriously limited, but not precluded in his ability to understand, remember, and carry out very short/simple instructions; work in proximity to others; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; interact appropriately with the general public; deal with normal work stresses; be aware of normal hazards; maintain socially appropriate behavior; travel in unfamiliar places; and, use public transportation.  (Tr. 268).  Dr. Smith indicated that plaintiff's chronic pain exacerbated his psychiatric condition.  He opined that plaintiff would likely be absent from work because of his impairments or treatment more than four days per month.  (Tr. 268).

On March 3, 2005, plaintiff told Chip Norris, a nurse practitioner, that most of his problems were under control.  (Tr. 301-302).  Mr. Norris refilled plaintiff's Sulindac, Niaspan, and Prilosec prescriptions and ordered lab tests.  (Tr. 301-302).

On March 15, 2005, Dr. Paul Wilbur noted that plaintiff could not afford all of his medications.  (Tr. 300).  He stated that he could help plaintiff obtain his Wellbutrin and Effexor, but referred him to Dr. Tammy Tucker to obtain samples of Zyprexa.  (Tr. 300).

On July 7, 2005, Dr. Caleb Gaston treated plaintiff for intermittent left heel pain.  (Tr. 293).  Plaintiff indicated that his condition had previously responded well to cortisone injections.  Dr. Gaston noted tenderness at the posterior aspect of plaintiff's left heel.  As such, he was referred to Dr. Marston and directed to continue his current medications.  (Tr. 293).

On July 29, 2005, Dr. Wilbur treated plaintiff for a sore throat and cough.  (Tr. 292).  Plaintiff voiced fears that he might have pneumonia.  Dr. Wilbur noted that plaintiff was in no

11

apparent distress, afebrile, and had clear lungs. However, he indicated that plaintiff's mother was overly protective, manipulative, and suggestive as to plaintiff's illness. Dr. Wilbur prescribed Keflex, and directed plaintiff to return in September for routine blood tests. (Tr. 292).

On September 15, 2005, plaintiff complained of lower right quadrant pain. (Tr. 288-291). He indicated that he was sick "all of the time," and had experienced frequent night fevers since his colon surgery. At this time, his blood pressure was 149/90. (Tr. 288-291).

On October 6, 2005, Dr. Bodunrin Badejo examined plaintiff. (Tr. 314-317). Plaintiff complained of daily reflux symptoms and indicated that he had not had a follow-up colonoscopy, due to his lack of medical insurance. He also reported smoking 4-5 cigarettes per day and drinking 4 beers twice weekly. Dr. Badejo noted plaintiff's history of depression, but indicated that plaintiff's mood and affect were both appropriate. He recommended that plaintiff continue taking the Prilosec and follow anti-reflux precautions. Dr. Badejo also scheduled plaintiff for an EGD to rule out Barrett's syndrome and a follow-up colonoscopy. (Tr. 314-317).

On October 13, 2005, plaintiff underwent a colonoscopy and an EGD. (Tr. 309-313). The procedures showed colon polyps, ileo-colonic anastomosis, diverticulosis, Los Angeles grade B esophagitis, irregular z-line versus short-segment Barrett's esophagus, and a hiatal hernia. Pathology confirmed the presence of gastroesophageal junction mucosa with mild active inflammation and focal mucosal hyperplasia. (Tr. 309-313).

On October 27, 2005, Dr. John Spore, a surgeon, evaluated plaintiff. (Tr. 306-307). An examination revealed a palpable mass, somewhat tender but reducible in the lower abdomen, at the site of his colectomy incision. Plaintiff stated that the mass had increased in size and discomfort. Dr. Spore diagnosed plaintiff with a ventral hernia and recommended surgical

12

repair.  (Tr. 306-607).  On November 3, 2005, plaintiff underwent hernia repair surgery.  (Tr. 308).

On March 30, 2006, plaintiff was evaluated by Dr. Gary Nunn, a internal medicine specialist.  (Tr. 328-330).  Plaintiff reported a history of frequent illnesses occurring one or two times per month with fever, nausea and, vomiting.  He admitted to experiencing suicidal thoughts, but said he had never attempted suicide.  Plaintiff also complained of insomnia, difficulty walking 1/8 mile, difficulty concentrating, depression, and difficulty sitting for one hour or two without becoming jittery and anxious.  Dr. Nunn diagnosed plaintiff with chronic depression, colon carcinoma, hyperlipidemia and chronic abdominal pain.  (Tr. 328-330)

This same date, Dr. Nunn completed a physical RFC assessment.  (Tr. 331).  He determined that plaintiff could occasionally lift up to 100 pounds and occasionally climb, balance, stoop, crouch, kneel and crawl. (Tr. 331).  He also indicated that plaintiff should avoid all exposure to heights and avoid moderate exposure to moving machinery, chemicals, noise, humidity, dust/fumes, temperature extremes, and vibrations.  (Tr. 331).

On August 19, 2006, the ALJ sent plaintiff to Dr. Robert Hudson, Ph.D, for a psychological evaluation.  (Tr. 332-337).  Plaintiff drove himself to the evaluation and reported an ability to fish, watch television, care for his personal needs, shop as needed, perform household chores, and cook.  In fact, plaintiff stated that he was working 20-25 hours per week picking up and delivering laundry, and had been doing so since March 2006.  Dr. Hudson administered psychological testing and plaintiff's personality test results were compatible with a person who is depressed and anxious, with long standing physical problems, often of a gastrointestinal nature.  He stated that individuals with this personality assessment often admit

13

to feelings of insecurity, inadequacy, and inferiority, and are typically not comfortable in groups. IQ testing also indicated that plaintiff was functioning within the borderline level of intellectual functioning (77).  Dr. Hudson noted that this score did not match the score obtained by Dr. Smith.  However, without information concerning the scales used in Dr. Smith's calculation, he could offer no explanation for the discrepancy.  Dr. Hudson diagnosed plaintiff with depressive disorder not otherwise specified, anxiety not otherwise specified, alcohol abuse in partial remission, personality disorder not otherwise specified, and BIF.  Based on the results of plaintiff's testing, Dr. Hudson indicated that plaintiff probably needed to try more medication or a different medication for his depression and anxiety.[2]  (Tr. 332-337).

This same date, Dr. Hudson completed a mental RFC assessment.  (Tr. 338-340).  He assessed plaintiff with moderate limitations in the areas of understanding, remembering, and carrying out detailed instructions; making judgments on simple work-related decisions; and, interacting appropriately with supervisors, the public, and co-workers.  Further, Dr. Hudson stated that plaintiff would have moderate to marked limitations in the area of responding appropriately to work pressures in a usual work setting.  He indicated that the exact the level of plaintiff's impairment with regard to understanding and remembering detailed instructions, carrying out detailed instructions and the ability to make judgments on simple work-related decisions would depend upon the degree of detail and the physical demands of the job.  Dr. Hudson also noted that plaintiff would not perform well in groups.  (Tr. 338).

---

[2]Dr. Hudson also noted that his assessment of plaintiff was performed strictly from a psychiatric viewpoint.  (Tr. 337).  Therefore, he was not taking into account any possible neurological deficits.  As such, he indicated that he and Dr. Smith's assessments were not necessarily at odds.  (Tr. 337)

14

IV.   **Discussion**:

Plaintiff contends that the ALJ erred in concluding that the plaintiff was not disabled. Specifically, plaintiff argues that the ALJ failed to evaluate the combined effect of all of plaintiff's impairments, failed to properly assess the credibility of the witnesses, erred in concluding that plaintiff could perform sedentary or light work, failed to propound a proper hypothetical question to the vocational expert, failed to develop the record, and failed to give Dr. Smith's opinion controlling weight.

A.   **Subjective Complaints**:

We first address the ALJ's assessment of plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. As the United States Court of Appeals for the Eighth Circuit recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's complaints were not fully credible. The testimony presented at the hearing as well as

15

the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

The record reflects that plaintiff had been diagnosed with colon cancer, osteoarthritis, obstructive airway disease, GERD, hyperlipids, and depression.  Initially, we note that plaintiff was diagnosed with colon cancer, underwent surgery to remove a portion of his colon, and then successfully completed 4 rounds of chemotherapy.   Although the first few rounds of chemotherapy did make him ill, it appears that he was able to complete the course of treatment without any severe side effects.  The lingering residual effects of plaintiff's cancer and surgery were abdominal pain, nausea, diarrhea, anal leakage, and mild bleeding following bowel movements.[3]  Although plaintiff states that he experiences these symptoms on a monthly basis, we note that he has not consistently addressed these problems with his doctor(s).  (Tr. 288-291, 328-330).  *See Edwards v. Barnhart*, 314 F.3d at 967 (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment).  Further, the record makes clear that plaintiff's diarrhea was responsive to Immodium.  *See Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling).  In

---

[3]By all accounts, plaintiff has remained cancer free since completing chemotherapy. A colonoscopy performed in October 2005 revealed only colon polyps, ileo-colonic anastomosis, and diverticulosis.  While we do believe that plaintiff's surgery and chemotherapy course could have caused him to be disabled for a period of time, we note that this course of treatment only lasted from June 2003 until May 2004.   (Tr. 186, 236-238). Because a plaintiff must show that his disability has lasted for at least twelve consecutive months, we cannot say that the ALJ erred in his evaluation of plaintiff's subjective complaints.

16

fact in March 2005, plaintiff told the nurse practitioner that most of his problems were under control. (Tr. 301-302).

In addition, it is clear that plaintiff was diagnosed with osteoarthritis. An x-ray of plaintiff's knee taken in February 2003 revealed minimal degenerative changes. (Tr. 165). A repeat x-ray in 2004 also revealed degenerative changes. (Tr. 255). Plaintiff has been prescribed Naproxen, Sulindac, and Tramadol to alleviate his pain. (Tr. 165, 242-244, 256). We note, however, that plaintiff has failed to report to his doctor(s) any limitations arising out of this condition. In fact, aside from Dr. Nunn's RFC assessment, plaintiff's activities have not been restricted by any of his treating doctors. *See Baldwin v. Barnhart*, 349 F.3d 549, 557 (8th Cir. 2003) (noting none of plaintiff's independent physicians restricted or limited her activities).

Pulmonary function tests also diagnosed plaintiff with obstructive airway disease. However, after plaintiff was given prescriptions to treat this condition, he failed to seek further treatment. *See Patrick*, 323 F.3d at 596.  in July 2005, an examination by Dr. Wilbur revealed clear breath sounds. (Tr. 292). Further, plaintiff has also continued to smoke, in spite of his diagnosis. (Tr. 223-228, 314-317). Therefore, we do not believe that the ALJ erred in concluding that plaintiff's lung impairment was not as severe as alleged.

Plaintiff has also been diagnosed with GERD. Initially, he experienced a great deal of discomfort due to this condition. An EGD performed in October 2005 revealed Los Angeles grade B esophagitis, irregular z-line versus short-segment Barrett's esophagus, and a hiatal hernia. (Tr. 309-313). However, more recent records suggest that the Prilosec prescribed to treat this condition has been effective, as plaintiff has not sought medical treatment for this condition since that time. *Id*.

17

The record does reveal that plaintiff has been diagnosed with hyperlipids. (Tr. 251, 258, 328-330).  However, we note that medication has been prescribed to treat this condition.  As there have been no complaints regarding medication side effects or limitations cause by his elevated lipid levels, we can find no evidence to contradict the ALJ's determination on this issue.  Although severe, we do not find it to be disabling, even when considered in combination with plaintiff's other alleged impairments.

As for plaintiff's depression, we do note that he has been diagnosed with depression and prescribed Wellbutrin, Effexor XR, and Zyprexa. (Tr. 300).  However, contrary to the plaintiff's argument, we do not find sufficient evidence in the record to support a finding of total disability due to a mental impairment.  In October 2003, plaintiff reported that his mood had improved while taking the Effexor XR.  (Tr. 256).  By November 2003, improvement was noted in his medical records. (Tr. 251, 258).  Then, in October 2005, Dr. Badejo indicated that plaintiff's mood and affect were both appropriate. (Tr. 314-317).

We note Dr. Smith's assessment of plaintiff and his diagnosis of organic brain syndrome and cognitive dysfunction, resulting from a closed head injury allegedly the result of a bicycle accident.  However, aside from Dr. Smith's assessment, the record is devoid of any evidence to indicate that this alleged accident occurred and/or resulted in a lasting brain impairment.  The record does not even contain a CT scan or an MRI of plaintiff's head showing the alleged brain insult.  In fact, according to the medical records before this court, plaintiff neither discussed this accident with his treating doctors, nor complained of problems resulting from said accident.  Therefore, it appears as though Dr. Smith relied on plaintiff's own subjective reports of a head injury, rather than objective medical findings.  In this regard, we believe it was only proper for

18

the ALJ not to give full weight to Dr. Smith's opinion. Clearly, had plaintiff sustained an injury to the degree assessed by Dr. Smith, it is reasonable to conclude that he would have sought medical treatment for his symptoms.

Perhaps the most damaging to his claim, however, is the fact that plaintiff returned to work in 2006. Although plaintiff is only working 20 to 25 hours per week picking up and delivering laundry, this does evidence his ability to work. *See* 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did. We will consider all of the medical and vocational evidence in your file to determine whether or not you have the ability to engage in substantial gainful activity."); *See Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005); *Gowell v. Apfel,* 242 F.3d 793, 798 (8th Cir. 2001). As such, we cannot say that plaintiff is totally disabled.

Plaintiff's own reports concerning his activities of daily living also contradict his claim of disability. Plaintiff has reported an ability to do laundry, wash dishes, make the bed/change the sheets, iron, vacuum/sweep, take out the trash, rake leaves, pay bills, use a checkbook, complete a money order, count change, prepare microwave dinners, watch television, read the newspaper, and go to the post office. (Tr. 95-98). He also indicated that he had no problems getting along with others. (Tr. 98). On paperwork plaintiff completed for his attorney, plaintiff indicated that he drove, washed dishes, made his bed, and groomed himself daily; cooked, cleaned house, dusted, vacuumed, mopped the floor, washed laundry, shopped for groceries, talked on the phone, went to church, and talked to neighbors weekly; and, fixed things on a monthly basis. (Tr. 124). He also reported lying down 8 hours per day, sitting down 8 hours per day, and stand/walking 8 hours per day. (Tr. 123). Further, by March 2006, plaintiff had

19

returned to work on a part-time basis.  *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).  Clearly, this level of activity is inconsistent with a finding of disability.

Therefore, although it is clear that plaintiff suffers from some degree of pain and discomfort, he has not established that he is unable to engage in any and all gainful activity, even when all of his limitations are considered in combination.  *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled).  Neither the medical evidence nor the reports concerning his daily activities supports plaintiff's contention of total disability.  Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

**B.      Credibility of the Witnesses:**

Plaintiff contends that the ALJ erred by failing to make a specific credibility ruling for each of the witnesses.  We note that the ALJ stated that plaintiff was found to not be fully credible due to the evidence contained in the file, as well as the testimony adduced at the hearing.

He also reviewed the testimony of plaintiff's mother and stated that her testimony merely corroborated that of the plaintiff. Although a credibility assessment of plaintiff's neighbor's testimony was not specifically noted in the record, a review of the record makes clear that this testimony was also merely cumulative evidence. Therefore, the ALJ's failure to include a specific credibility ruling is inconsequential. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) (ALJ's failure to give specific reasons for disregarding testimony of claimant's husband was inconsequential, as same reasons ALJ gave to discredit claimant could serve as basis for discrediting husband).

### C.   Failure to Develop the Record:

Although plaintiff contends that the ALJ failed to properly develop the record, we do not agree. The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled. *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994); 20 C.F.R. §§ 404.1519a(b) and 416.919a(b) (2006). In this matter, however, the record contains ample objective, as well as subjective support for the ALJ's decision. The record reflects that the ALJ has already sent plaintiff for a psychological examination. No further development of the record is necessary. While it does appear that plaintiff has some limitations that affect his ability to perform all levels of work, both physically and mentally, plaintiff's return to work has evidenced the fact that he remains capable of performing some work.

### D.   RFC Assessment:

Plaintiff also contends that the ALJ erred in finding that he maintained the RFC to perform a range of light work. It is well settled that the ALJ "bears the primary responsibility

AO72A
(Rev. 8/82)

for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).  The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000). Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.154599(c), while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional. *Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs.*, 662 F. Supp. 954, 955, 956 (W.D. Ark. 1987) (RFC was "medical question,"and medical evidence was required to establish how claimant's heart attacks affected his RFC).

In the present case, the ALJ considered the medical assessments of examining agency medical consultants, plaintiff's subjective complaints, and his medical records.  In March 2006, Dr. Nunn concluded that plaintiff could occasionally lift up to 100 pounds and occasionally climb, balance, stoop, crouch, kneel and crawl.  (Tr. 331).  He also indicated that plaintiff should avoid all exposure to heights and avoid moderate exposure to moving machinery, chemicals, noise, humidity, dust/fumes, temperature extremes, and vibrations.  (Tr. 331).

In August 2006, Dr. Hudson diagnosed plaintiff with depressive disorder not otherwise specified, anxiety not otherwise specified, alcohol abuse in partial remission, personality disorder not otherwise specified, and BIF.  (Tr. 332-337).  He assessed plaintiff with moderate limitations

22

in the areas of understanding, remembering, and carrying out detailed instructions; making judgments on simple work-related decisions; and, interacting appropriately with supervisors, the public, and co-workers. Further, Dr. Hudson stated that plaintiff would have moderate to marked limitations in the area of responding appropriately to work pressures in a usual work setting. He indicated that the exact level of plaintiff's impairment with regard to understanding and remembering detailed instructions, carrying out detailed instructions and the ability to make judgments on simple work-related decisions would depend upon the degree of detail and the physical demands of the job. Dr. Hudson also noted that plaintiff would not perform well in groups. (Tr. 338).

Plaintiff contends that the ALJ dismissed both Dr. Hudson and Dr. Smith's assessments and resorted to playing "amateur doctor." However, it is clear that the ALJ adopted Dr. Hudson's limitations into his RFC assessment. He concluded that plaintiff had a satisfactory ability to understand, remember, and carry out detailed instructions, make judgments on simple work-related decisions, interact appropriately with supervisors, the public, and co-workers; and, respond appropriately to changes in a routine work setting. He also found him to be seriously limited, but not precluded, from responding appropriately to work pressures in a usual work setting. (Tr. 16).

As for the plaintiff's argument that the ALJ exhibited bias towards Dr. Smith's assessment due to problems the ALJ had with Dr. Smith, we disagree. We have reviewed the ALJ's opinion thoroughly, as well as the record, and do not see bias. As previously mentioned, it is clear that Dr. Smith's opinion was largely based on plaintiff's own reports concerning his bicycle accident as opposed to actual medical records documenting plaintiff's injuries. There

23

is simply no other medical evidence to support Dr. Smith's findings. We also note Dr. Smith's contention that plaintiff could not return to work was contradicted by the fact that plaintiff did return to work. As such, the ALJ was not required to give Dr. Smith's opinion controlling weight.

Plaintiff also contends that the ALJ erred in concluding that he could lift 10 pounds frequently because Dr. Nunn's assessment stated that he could lift up to 100 pounds occasionally. Clearly, if plaintiff could lift 100 pounds occasionally, he would be able to lift lesser weights on a more frequent basis. We note that plaintiff has reported the ability to perform a variety of household tasks and activities that could require him to lift 20 pounds frequently. Therefore, we do not find this argument to be persuasive. As there is no evidence to show that plaintiff is not capable of lifting 10 pounds frequently, the ALJ's assessment will stand.

**E.   Return to Work**:

We also find that substantial evidence supports the ALJ's finding that plaintiff can still perform work that exists in significant numbers in the national economy. In response to interrogatories submitted by the ALJ, the vocational expert indicated that a person of plaintiff's age, education, employment background, and RFC could perform work as a food preparer, housekeeper, and plastics worker. (Tr. 140). *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996).

**F.   Dictionary of Occupational Titles ("DOT")**:

A review of the DOT reveals that the positions identified by the vocational expert are categorized as light work and do not require activities that are precluded by plaintiff's RFC. *See*

24

Dictionary of Occupational Titles, §§ 311.677-010, 323.687-014, 605.685-054, *at* www.westlaw.com.

V.      **Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus recommends that the decision be affirmed, and plaintiff's Complaint be dismissed with prejudice.  **The parties have ten days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections ay result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 29th day of May 2008.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

25